Filed 10/26/20  In re A.G. CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

|  |  |
|---|---|
| In re A.G., a Person Coming Under the Juvenile Court Law. | |
| ORANGE COUNTY SOCIAL SERVICES AGENCY,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>MICHAEL G.,<br><br>    Defendant and Appellant. | G059045<br><br>(Super. Ct. No. 19DP1381)<br><br>O P I N I O N |

Appeal from an order of the Superior Court of Orange County, Antony C. Ufland, Judge.  Affirmed.

Marisa L. D. Conroy, under appointment by the Court of Appeal, for Defendant and Appellant.

Leon J. Page, County Counsel, Karen L. Christensen and Jeannie Su, Deputy County Counsel, for Plaintiff and Respondent.

*     *     *

A teenage girl left home due to her father's escalating mental health issues. She reported her father heard voices and had delusions of persecution by demons, witches, and the government; he yelled, threw things, and punched the walls in their home. The father denied any mental health issues or aggressive conduct.

The juvenile court found the child's reports were credible and concluded the father's mental health issues, coupled with the out-of-state mother's mental health issues, failure to maintain a relationship with the child, and criminal history, put the child at risk of suffering serious physical harm. Based on these findings, the court assumed jurisdiction over the child and removed her from her parents' custody.

The father challenges the juvenile court's jurisdictional finding and disposition order. For the reasons below, we affirm.

## FACTS

In the fall of 2019, then 14-year-old A.G. lived alone with her father, Michael G. (Father). A.G. was not in contact with her mother, Kristie G. (Mother), who lives in North Carolina. Mother's background includes mental health issues, psychiatric hospitalization, alcohol abuse, and a criminal history. Mother attempted suicide in 2012.

A.G. has two older brothers, Ian and Shane, but they both moved in with the F. Family, which became their informal guardians when they were 16 and 13 years old. A.G. used to spend weekends with the F. Family, but Father stopped allowing the visits because he said the F. Family was "the devil."

According to A.G., Father often spoke about demons, witchcraft, and government conspiracies. She and Father abruptly moved out of their previous home in

2

August 2019 because Father believed it was bugged by the government and under the influence of witches and demons.

According to A.G., in late October 2019, Father stopped going to work, moved some of their things to storage, and put down the seats in the car. When A.G. asked him what was going on, Father whispered, "'we're moving,'" "'the devils are listening,'" and "'I'm trying to move quietly.'" When he would not say where they were going, A.G. panicked. Father told her the devils were coming for her, and claimed she would be turned into a prostitute. A.G. went to her room, where she cried and "'had a breakdown.'" She then called her brother Ian to come get her because she was afraid she would be hurt. She heard Father yelling and screaming, so she ran to a nearby restaurant, where her friend's mother picked her up. The police and Ian met A.G. at her friend's house. After the meeting, A.G. went with Ian to spend the night at the F. Family's home.

Ian called Father. He said Father was yelling and at times sounded "possessed." When Ian called back later, Father had a normal voice. Father said he would not tell Ian where they were going because of the government.

The following day, Father sent A.G. a text: "I speak the truth to you. My intent is to protect you. You will not fully understand unless you work at a high level in government. I have been careful not to leak information, but I have given you enough info that you can make a rational decision. I pray for Truth to be shown to you and that these devils be exposed to you. In the name of Jesus Christ."

The Orange County Child Abuse Registry received a report that Father's mental health was having a negative impact on A.G. During a social worker interview, A.G. reported Father frequently talked to himself and said demons, witches, and the government were against him. She said he often told her that voices told him to do things, and he talked to demons. A.G. described one occasion when Father was in bed, felt paralyzed, and made her read the Bible to him for several hours, until he finally said,

3

"'See, the demons had me for a minute.'"  A.G. further reported Father said the government could hear him and frequently yelled out the car window while driving.

A.G. denied any sexual or physical abuse and said her basic needs were met by Father.  However, she reported she often woke up to Father "throwing things and yelling, punching walls, and breaking things."  He also had loud outbursts, yelling things like "'you're being trained to be a prostitute'" or "'that's witchcraft.'"  On one occasion, A.G. saw Father break a window; Father then claimed a devil did it.

A.G. reported Father's behavior had been worsening for two years, to the point she was now afraid of him.  She became visibly upset when talking about him and said she did not feel safe going back home.  She was afraid the voices in his head would tell him to hurt her or others, adding this was "'the worse he has been.'"

The juvenile court issued a protective custody warrant to remove A.G. from Father's custody, finding A.G.'s physical environment posed a threat to her health or safety.  Orange County Social Services Agency (SSA) then filed a juvenile dependency petition on A.G.'s behalf.  Among other allegations, the petition alleged A.G. fell within the court's jurisdiction under Welfare and Institutions Code section 300 (§ 300), subdivision (b)(1), based in part on Father's "escalating mental health issues."  The petition also included allegations based on Mother's mental health issues, criminal history, and failure to maintain a relationship with the child.

The juvenile court detained A.G.; she was placed in the care of her brother Ian and her adult friend Debra F.  The court ordered SSA to provide reunification services and encouraged Father to participate in therapy.

A social worker interviewed Father and reported his home was clean and posed no safety concerns.  Father denied having any mental health issues, hearing voices, throwing or breaking items, believing his residence was bugged, or engaging in erratic behavior.  However, he repeatedly mentioned witches, demons, and the government.  For example, he explained he had worked as a forensic scientist at the Orange County Sheriff

4

Department Crime Lab for 17 years, "there was witchcraft involved," but he could not talk about it because he did not want to be a "'leaker.'"

Father explained he loves A.G., and her issue is that she does not want to move out of state. He said California lacks morality, and he wants to relocate to a state that accepts the Bible. He further explained he wants to protect A.G. from witch covens that harbor children. He repeatedly expressed concern "'they are trying to get her.'" He added he wants to prevent A.G. from becoming a state harlot or prostitute, whom he defined as someone who is brainwashed by the State of California and who commits her soul to the anti-Christian agenda.

Father initially told the social worker he would enroll in the recommended services of individual counseling and parent education, but he later reported he had not done so because he had been "very busy." When the social worker checked in with Father the following month, he said he would not pursue counseling until it was ordered by the court.

After A.G. was detained, she occasionally spoke with Father on the phone. She reported to the social worker that Father "'tries to make [her] feel bad for him,'" claims he doesn't "'need help,'" and is acting as though nothing is wrong.

The social worker interviewed A.G.'s adult brother Ian, who reported Father has mental health issues that began getting worse two years ago. Ian indicated Father can present as very normal, and then a switch flips and he "go[es] off on a rant." He said Father "'talks to things that aren't there,'" believes the government is going to get him, thinks artificial intelligence is taking over the world, and often talks about demons, witchcraft, the government, and various other "'warnings.'" He reported Father once told him and A.G. to "'stay away from the government'" and "'don't become a cannibal and drink human blood.'" Ian was concerned because he heard the things Father said when talking to the voices, and he worried about the voices telling Father to harm A.G.

The social worker also interviewed Ian's informal guardian, Debra F., who reported Father's mental health had gotten progressively worse in the past two years. Debra had heard him rant about the government and religion, and about how demons were after him and A.G. She also had observed Father "'speaking to voices that aren't there'" and going on "'incoherent'" rants. Father told members of the F. Family they were "the devil" and accused them of brainwashing A.G. and her brothers. Debra reported A.G had grown especially frightened of Father in the past month.

The social worker also interviewed Leo F., who reported that over the past two years Father had started to limit A.G.'s contact with the F. Family and started pulling her from activities. Father has been fixating on demons and accused Debra and Leo of being "devils" and "'stealing the children.'" Leo was concerned Father was hearing voices that were commanding him to do things, and he worried for A.G.'s safety. Leo believes Father has "'schizophrenia or dementia'" and his condition was causing A.G. trauma.

The social worker also interviewed A.G.'s friend's mother, Michelle S., who described Father as "'erratic and easily agitated'" and a "conspiracy theorist." Michelle's daughter had witnessed Father going off about the devil and saw him scream out the car window about demons. Michelle was concerned Father was isolating A.G. from friends and family.

At the jurisdiction/disposition hearing, the juvenile court admitted into evidence SSA's various reports, including its Jurisdiction/Disposition Report, in which SSA recommended the court sustain the petition, declare dependency, offer family reunification services to the parents, and order a psychological evaluation under Evidence Code section 730 for Father. In these reports, the social worker concluded Father "may have unresolved and undiagnosed mental health issues that present as delusions, disordered thoughts, and excessive talk about the government, witches, state harlots, prostitutes, and cult like government brain washing." She therefore recommended

6

custody be vested in the Social Services Director, and the family be given the opportunity to receive services to stabilize their mental health and treatment.

Father was the only witness to testify at the jurisdiction/disposition hearing. He denied hearing voices, punching walls, throwing things in A.G.'s presence, or believing the government bugged his house. He also denied ever having an impulse to be violent or aggressive toward A.G., and he denied being told by a demon or witch to do anything aggressive toward her.

Father testified he is a Christian and believes in demons and witches, whom he defined as humans who call up demons. He added that witches "make themselves present to [him]," "give [him] dirty looks," and leave three twigs shaped like a crow's foot on the sidewalk in front of him.

Father also testified he is "constantly tested mentally" by various branches of the government. However, he asserted he could not testify about his work for the Sheriff's Department because he made a personal oath of confidentiality and "it would be a detriment to [him] if [he] started leaking these methodologies."

Father expressed concern that if A.G. remains in California, she will pick up on its "antichrist" ways and end up a prostitute or a harlot, whom he defined as someone who turns from God and commits idolatry. He testified he once felt paralyzed and had trouble breathing, so he asked A.G. to read the Bible to him for thirty minutes to deter any demons. He denied ever telling A.G. he was talking to demons or devils, or telling her demons were talking to him.

Counsel for SSA and A.G. both argued in support of SSA's recommendations, and Mother's counsel agreed the juvenile court should assume jurisdiction. Father's counsel argued the court should dismiss the petition for lack of evidence that Father has mental health issues.

The juvenile court amended the petition by striking an allegation that Mother's whereabouts are unknown. It then sustained the petition as amended, finding

A.G. came under section 300, subdivision (b)(1), as a result of her parents' failure or inability to supervise or protect her adequately and their inability to provide regular care due to their mental illness or substance abuse.

In announcing its ruling, the juvenile court observed Father's testimony was inconsistent with SSA's reports, and on balance, it found the reports credible. The court recognized Father "is entitled and protected in believing in any faith," but found his actions, "paranoid ideation[s]," and "unresolved mental health" issues put A.G. "in danger" and are "physically negatively affecting" her. The court also expressed concern that Father does not recognize he needs help for his unresolved mental health issues.

The juvenile court then removed custody from both parents, finding by clear and convincing evidence that vesting custody with them would be detrimental to A.G. The court ordered reunification services for both parents, medical or psychological treatment for Father, a section 730 evaluation for Father, and ten hours of weekly monitored visitation.

Father filed a notice of appeal.

## DISCUSSION

1. *Standard of Review*

We review the juvenile court's jurisdictional finding and disposition order under the substantial evidence standard. (*In re J.C.* (2014) 233 Cal.App.4th 1, 6.) We must therefore "'determine if substantial evidence, contradicted or uncontradicted, supports'" the court's finding and order. (*In re I.J.* (2013) 56 Cal.4th 766, 773 (*I.J.*).) Substantial evidence is "'evidence which is reasonable, credible, and of solid value.'" (*In re Angelia P.* (1981) 28 Cal.3d 908, 924.)

""""In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of

8

fact and credibility are the province of the trial court." [Citation.] "We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court."'" (*I.J., supra*, 56 Cal.4th at p. 773.)

      2.    *The Jurisdictional Finding*

Father challenges the sufficiency of the evidence to support the juvenile court's order sustaining the petition and taking jurisdiction over A.G. under section 300. We reject his argument because substantial evidence supports the court's ruling.[1]

A child comes within the juvenile court's jurisdiction under section 300, subdivision (b)(1), when "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness" from her parents' failure or inability "to adequately supervise or protect the child" or "provide regular care for the child due to the parent's or guardian's mental illness, developmental disability, or substance abuse." (§ 300, subd. (b)(1).) "[S]ection 300(b)(1) authorizes dependency jurisdiction without a finding that a parent is at fault or blameworthy for her failure or inability to supervise or protect her child." (*In re R.T.* (2017) 3 Cal.5th 622, 624 (*R.T.*).)

---

[1]    As a preliminary matter, SSA contends we should sustain jurisdiction based on the petition's unchallenged allegations that Mother has mental health issues, has a criminal history, and has not maintained a relationship with or provided for the child for years. (See *In re Briana V.* (2015) 236 Cal.App.4th 297, 309 ["we need not address jurisdictional findings involving one parent where there are unchallenged findings involving the other parent"]; *In re I.A.* (2011) 201 Cal.App.4th 1484, 1491 ["[I]t is necessary only for the court to find that one parent's conduct has created circumstances triggering section 300 for the court to assert jurisdiction over the child"].) But "we generally will exercise our discretion and reach the merits of a challenge to any jurisdictional finding when the finding . . . serves as the basis for dispositional orders that are also challenged on appeal." (*In re Drake M.* (2012) 211 Cal.App.4th 754, 762.) Because the court's jurisdictional finding served as the basis for the dispositional order that Father also challenges on appeal, we address the merits of Father's challenge to the court's jurisdictional finding.

"[T]he law is settled that harm may not be presumed from the mere fact of a parent's mental illness." (*In re A.L.* (2017) 18 Cal.App.5th 1044, 1050; see *In re Jamie M*. (1982) 134 Cal.App.3d 530, 541 [schizophrenic parent is not presumably detrimental to offspring, noting "[t]here are innumerable eccentric parents whose behavior on certain occasions may be less then socially acceptable and yet they are loving and compassionate parents"].) To sustain a petition based on a parent's mental illness, the "mental illness and resulting behavior [must] adversely affect the child or jeopardize the child's safety." (*Kimberly R. v. Superior Court* (2002) 96 Cal.App.4th 1067, 1079; see *In re Daisy H*. (2011) 192 Cal.App.4th 713, 718 [reversing jurisdiction finding where there was no evidence linking Father's paranoia and hallucinations to physical harm or risk of physical harm to children]; *In re David M*. (2005) 134 Cal.App.4th 822, 830, overruled on other grounds in *R.T., supra,* 3 Cal.5th 622, 628 [reversing jurisdiction finding where SSA failed to provide "evidence of a specific, defined risk of harm to [children] resulting from mother's or father's mental illness"].)

Applying those authorities here, we conclude substantial evidence supports the juvenile's court's jurisdictional finding. The descriptions of Father's behavior provided by A.G., Ian, Debra, Leo, and Michelle, as well as the social worker's recommendations, all suggest Father is mentally ill and at times erratic, aggressive, and violent. A.G. credibly reported Father frequently threw things and punched walls in her presence, yelled at things only he could see, broke a window and then claimed a devil did it, and had loud outbursts in which he called A.G. a prostitute. A.G. also reported his condition was getting progressively worse, to the point she did not feel safe with him and feared the voices in his head would tell him to hurt her or others. The court could reasonably conclude A.G. was at risk of suffering serious physical harm as a result of these issues.

We recognize Father denies having any mental condition and denies engaging in those aggressive behaviors. However, the juvenile court found Father's

10

testimony not credible. We may not second-guess that finding. Indeed, the substantial evidence standard requires us to leave credibility determinations to the juvenile court, and for good reason. "[C]redibility is governed by more than just the words transcribed by a court reporter." (*In re Jessica C.* (2001) 93 Cal.App.4th 1027, 1043.) "We review a cold record and, unlike a trial court, have no opportunity to observe the appearance and demeanor of the witnesses." (*In re Sheila B*. (1993) 19 Cal.App.4th 187, 199.) We defer "to the trier of fact on [credibility] determinations, and ha[ve] no power to judge the effect or value of, or to weigh the evidence; to consider the credibility of witnesses; or to resolve conflicts in, or make inferences or deductions from the evidence. . . . [Citation.] . . . [Citations.] It is not [our] function, in short, to redetermine the facts." (*Id.* at pp. 199-200.)

As was the juvenile court, we are mindful of and sensitive to Father's First Amendment right to religious freedom. In this case, however, we believe the risk posed to A.G. was less a function of Father's religious beliefs, and more the result of his aggressive outbursts, delusional behavior, paranoid ideations, and unwillingness to seek help for his mental illness. "Mistreatment of a child . . . is not privileged because it is imposed in the guise of freedom of religious expression." (*In re Edward C*. (1981) 126 Cal.App.3d 193, 202.) We therefore conclude substantial evidence supports the juvenile court's finding there was a substantial risk A.G. will suffer serious physical harm from Father's behavior and untreated mental illness. We thus affirm the jurisdictional finding.

3.     *The Disposition Order*

Father also challenges the juvenile court's dispositional finding and order under Welfare and Institutions Code section 361 (§ 361), in which the court found a substantial risk of future harm to A.G. if the court returned her to her parents' custody.

Under section 361, after a minor is adjudged a dependent of the juvenile court under section 300, the court may limit the parents' control over the child. (§ 361, subd. (a)(1).) The statute further specifies, however, that the child shall not be taken

11

from her parents' physical custody unless the court finds by clear and convincing evidence "[t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's . . . physical custody." (§ 361, subd. (c)(1).)

Thus, "[b]efore the court may order a child physically removed from his or her parent, it must find, by clear and convincing evidence, that the child would be at substantial risk of harm if returned home and that there are no reasonable means by which the child can be protected without removal. [Citations.] . . . [Citation.] The parent need not be dangerous and the child need not have been actually harmed for removal to be appropriate. The focus of the statute is on averting harm to the child." (*In re Cole C.* (2009) 174 Cal.App.4th 900, 917.) "Although the court must consider alternatives to removal, it has broad discretion in making a dispositional order." (*Id.* at p. 918.)

Here, the juvenile court found by clear and convincing evidence that "vest[ing] custody with the parents would be detrimental to the child," and "vest[ing] custody with the social services director is required to serve [her] best interest." It further found "reasonable efforts were made to prevent or eliminate the need for removal from . . . her home." In its minute order, the court observed SSA made "reasonable efforts to enable the child's safe return home," but found "continued placement is necessary and appropriate" because "the extent of progress that has been made [by Father] toward alleviating or mitigating the causes necessitating placement . . . has been minimal."

Father contends there was no evidence of a substantial risk of harm to A.G. if she returned home. We disagree. As discussed above, there was substantial evidence Father's condition posed a threat to A.G.'s physical safety at the time of the hearing.

12

Father contends the juvenile court erred by failing to consider his proposed less-restrictive alternatives, such as ordering in-home parenting to check in with the family on a regular basis, having a social worker regularly check in with Father, or having A.G., who was 14 years old, advocate for herself and seek assistance when needed. But none of Father's proposed alternatives would eliminate the substantial danger to A.G. posed by Father's deteriorating mental health and his volatile and unpredictable behavior. A.G. herself told the court she was increasingly afraid that Father would hurt her. As the court recognized, removal was in A.G.'s best interest given Father's "minimal" progress in addressing the causes necessitating placement.

We therefore find no error in the juvenile court's disposition order removing A.G. from Father's custody.

## DISPOSITION

The juvenile court's jurisdictional finding and disposition order are affirmed.


GOETHALS, J.

WE CONCUR:


MOORE, ACTING P. J.


FYBEL, J.

13